UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAMES PERKINS, | § |
| | § |
| Plaintiff, | § |
| VS. | § CIVIL ACTION NO. H-11-1102 |
| | § |
| METROPOLITAN TRANSIT AUTHORITY | § |
| OF HARRIS COUNTY, TEXAS, *et al*, | § |
| | § |
| Defendants. | § |

**MEMORANDUM OPINION AND ORDER**

**I.     INTRODUCTION**

Pending before the Court is the defendant's, Metropolitan Transit Authority of Harris County, Texas ("Metro"), motion for summary judgment (Docket No. 27), the plaintiff's, James Perkins ("Perkins"), response (Docket No. 28), and Metro's Reply (Docket No. 29). Having carefully reviewed the parties' submissions, the record and the applicable law, the Court hereby GRANTS Metro's motion for summary judgment.[1]

**II.    FACTUAL BACKGROUND**

James Perkins started working for Metro in 1984 and was promoted to Superintendent of Maintenance in 2000. In 2006, Metro hired James Gerhart as Superintendent of Maintenance. Perkins claims that he had to train Gerhart because Gerhart had no experience in bus fleet maintenance. John Walsh, Senior Director of Maintenance, subsequently announced that Gerhart was to replace Perkins as superintendent of the West Facility, Perkins was to replace Donna

---

[1] In its motion, Metro addresses only the claims against the individual defendants, Andre Hines and Marvin Ledet; the motion does not address Perkins' claim against Metro for employment discrimination and wrongful termination. Also, in its response, Perkins reports that he is "voluntarily dismissing his claims against" Hines. Therefore, the Court's decision pertains solely to the section 1983 claims against Ledet.

LaForce at the Fallbrook Facility, and LaForce was transferred to the Kashmere Facility.[2] Perkins was the only black superintendent and LaForce was the only female superintendent. According to Perkins, although Walsh stated that his plan was to relocate all of the superintendents, only Perkins and LaForce were transferred.

In September 2007, a report of salaries revealed that LaForce and Perkins were the lowest paid superintendents, with the exception of a newly hired man, whom Perkins claims had no prior experience as superintendent of maintenance. The report indicated that Gerhart, who is white and whom Perkins had trained, was earning almost $20,000 more a year than Perkins and LaForce. After raises were given in December 2007, Perkins became the lowest paid superintendent and LaForce was the second lowest. Perkins and LaForce subsequently filed EEO complaints, alleging that the salary difference was the result of gender and race discrimination. After investigating the complaints, Metro stated that Gerhart's business skills justified the salary difference. Perkins alleges that after he and LaForce filed the EEO complaints, Walsh became openly hostile toward them. Walsh resigned in 2007 after a violence against women complaint was filed against him. Perkins and LaForce provided statements in connection with the complaint against Walsh. Andrew Skabowski replaced Walsh as Senior Director of Maintenance and, according to Perkins, Skabowski was also openly hostile to Perkins and LaForce. In February 2008, LaForce filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining about the salary differences between superintendents.

On September 5, 2008, Christopher Officer, a bus cleaner, was randomly selected for a drug test. Perkins, the superintendent at the facility, asked Jeff Long, another employee, to drive

---

[2]Perkins claims that the West Facility, where he had been assigned before being replaced by Gerhart, was one of the newest and largest Metro facilities and that Gerhart was originally hired for the Kashmere facility.

Officer to the testing location. Perkins claims that after Officer and Long departed, Roy Patton, a foreman at the facility, informed Perkins that Officer was sick and that he had never clocked in. Perkins alleges that he asked Officer to return to Metro because, consistent with Metro policies in place at the time, Officer should not have been tested since he had reported that he was sick and had not clocked in. Upon his return, Officer was allowed to go home. Perkins shredded the drug testing form that had been prepared because, due to an incident years earlier where a cleaner was pulling sensitive documents from the trash, it was his routine practice to shred drafts and non-important documents.[3] On September 8, 2008, Perkins signed a form approving a sick leave pay request for Officer for September 5, 2008.

A few days later, on September 11 or 12, 2008, Perkins received a telephone call asking him to suspend Officer pending an investigation. Perkins suspended Officer but did not "give it much thought." At that time, Perkins had no idea that he was suspected of wrongdoing. Subsequently, Andre Hines and Marvin Ledet, police officers with the Metro Police Department, started an investigation to determine why Officer had not been tested on September 5, 2008. Ledet interviewed Perkins, Patton, and other Metro employees.

During an interview of Perkins on October 13, 2008, Ledet showed Perkins a portion of a videotaped interview with Patton. In the videotaped interview, Patton reported that he told Perkins that Officer had smoked marijuana and that was the real reason why Perkins had called Officer back from the drug test.

On January 15, 2009, LaForce filed a lawsuit against Metro, alleging gender discrimination and retaliation. LaForce's lawsuit referred "repeatedly" to the discrimination

---

[3] Metro disputes Perkins' explanation for shredding the document and claims that Perkins did it to justify the fact that Officer had not completed the drug testing. Metro further claims that Perkins also instructed his subordinates to change Officer's time card by replacing a foreman's initial entry of "M" (for Miscellaneous) to "S" (for sickness).

against Perkins and named Andrew Skabowski, then the Director of Maintenance and Perkins' immediate supervisor, as having participated in the discriminatory behavior. On January 23, 2009, Perkins was placed on administrative leave without pay.  Perkins claims that although he was not informed why he was suspended, he was able to ascertain that it was related to Officer being called back from the random drug test. On February 24, 2009, Perkins' counsel sent a letter to the president of Metro, threatening to file a discrimination charge with the EEOC and a lawsuit if Perkins was not immediately reinstated; Perkins was terminated the following day.

Perkins subsequently learned that he had been indicted on a felony charge of tampering with a government record, namely the form he had signed to approve Officer's request for sick pay for September 5, 2008.  Perkins claims that he later learned that Patton, the only witness who implicated him in wrongdoing, had changed his testimony after Ledet threatened him with criminal charges.  According to Perkins, Ledet also told Patton that he might be able to keep his job if Patton implicated Perkins in wrongdoing. All criminal charges were dismissed against Perkins after the indictment but before trial.

Perkins filed the instant suit claiming that Metro discriminated against him because of his race and, when he complained about the discrimination, Metro retaliated by terminating his employment and bringing false criminal charges against him in violation of Chapter 21 of the Texas Labor Code.  Perkins also claims that the individual defendants, Ledet and Hines, violated 42 U.S.C. § 1983 by coercing false statements from Patton for the purpose of depriving Perkins of his Fourth Amendment rights.

### III.     CONTENTIONS OF THE PARTIES

#### A.     The Plaintiff's Contentions

James Perkins claims that Andre Hines and Marvin Ledet, police officers with Metro, violated 42 U.S.C. § 1983 by suborning false testimony from Roy Patton, which they then presented to the District Attorney's Office in order to have Perkins indicted, thereby violating Perkins' Fourth Amendment rights.  Perkins further argues that Ledet and Hines are not entitled to qualified immunity.[4]

#### B.     The Defendant's Contentions

Metro argues that Hines and Ledet are entitled to qualified immunity from suit because Perkins has not alleged sufficient facts which, if believed, would demonstrate that Hines and/or Ledet engaged in conduct that amounted to a constitutional violation.  Metro further claims that even assuming that Perkins could establish a constitutional violation, his claim still fails because he cannot demonstrate that either Hines or Ledet acted in an objectively unreasonable manner. Therefore, Metro requests that the Court grant its motion for summary judgment.

### IV.     SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c).  "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact."  *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998)

---

[4] The Fourth Amendment pertains to unreasonable searches and seizures.  Section 1983 provides that, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

(citing *Celotex v. Catrett*, 477 U.S. 317, 322–25 (1986). Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. FED. R. CIV. P. 56(e). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625. "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004). Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251–52).

V.  ANALYSIS AND DISCUSSION

The Court finds that Marvin Ledet is entitled to qualified immunity from section 1983 liability because Ledet's alleged conduct during the interrogation of a third-party witness did not violate the constitutional rights of that witness, let alone the rights of the plaintiff, James Perkins.[5] Therefore, the Court grants Metro's motion for summary judgment.

---

[5] As noted, the plaintiff has indicated that he "is voluntarily dismissing his claims against" the other defendant, Andre Hines. Therefore, this Opinion will only address the section 1983 claims against Marvin Ledet.

In deciding whether a public official is entitled to qualified immunity from section 1983 liability, a court must first determine whether the plaintiff's allegations establish that the official's conduct violated a constitutional right. "If, and only if, the court finds a violation of a constitutional right," then the next step is to ask whether that right was "clearly established" in "light of the specific context of the case." *Scott v. Harris*, 550 U.S. 372, 377 (2007); *see also Chavez v. Martinez*, 538 U.S. 760, 766 (2003); *Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012).

Perkins claims that Ledet, while working as a police officer with Metro, coerced false testimony from Patton which he then presented to the District Attorney's Office in order to have Perkins indicted, thereby violating Perkins' Fourth Amendment right against unreasonable seizure. Since Perkins' claim is not a model of clarity, the Court interprets it to mean either that: (1) Ledet's alleged violation of Patton's rights during Patton's interrogation violated Perkins' Fourth Amendment rights because information from Patton's interrogation was subsequently used to file criminal charges against Perkins; or (2) Ledet's alleged coercion of false statements from Patton, which were then used to file charges against Perkins, violated Perkins' substantive due process rights under the Fourteenth Amendment. Under either interpretation, Perkins' claims fail because the Court finds that Ledet's conduct did not amount to a constitutional violation.

If Perkins' claim is literally viewed as an alleged violation of his Fourth Amendment rights, he has cited no authority, and the Court is not aware of any, where a court has found that the alleged violation of the constitutional rights of a third-party (in this case Roy Patton), amounted to a violation of the plaintiff's Fourth Amendment rights. Indeed, the Supreme Court has consistently held that, in the Fourth Amendment context, one must assert a violation of his

rights and not the rights of another person. *See e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 88 (1998 (noting that a person must be able to establish the violation of his and not someone else's Fourth Amendment rights); *Rakas v. Illinois*, 439 U.S. 128, 132 (1978) (noting that defendants will fail "to establish any prejudice to their own constitutional rights [when] they were not the persons aggrieved by the unlawful" police conduct).

Nevertheless, even assuming that Perkins could rely on Patton's interrogation to raise a Fourth Amendment claim, Perkins' claim still fails because Ledet did not violate Patton's constitutional rights. According to Perkins, Ledet obtained false statements from Patton by, *inter alia*, threatening Patton with criminal charges and telling him that he might be able to keep his job if he implicated Perkins in wrongdoing. Having reviewed the parties' exhibits, including the transcript of Ledet's interview of Patton, the Court finds that Ledet's conduct was not improper and he did not unduly influence Patton to make a false statement. Rather, Ledet encouraged Patton to cooperate with the authorities and informed Patton of the realistic consequences/penalties of not cooperating and/or lying to the authorities. *See United States v. Davis*, 912 F.Supp.245, 248 (S.D. Tex. 1995) (noting that it is not improper for an official to encourage cooperation with the government and to inform a defendant of the realistic penalties for his cooperation and/or noncooperation) (citations omitted). Importantly, in his deposition, Patton admitted that Ledet never asked him to lie. Similarly, in his own deposition, Perkins was unable to articulate how Ledet had coerced Patton or anyone else involved in the investigation. Since the Court concludes that Ledet did not violate Patton's constitutional rights, Perkins' Fourth Amendment claim, which is premised on the alleged violation of Patton's rights, must necessarily fail. *See Manis v. Lawson*, 585 F.3d 839, 847 (5th Cir. 2009) (the official was immune from liability because he did not violate the Fourth Amendment); *Mace v. City of*

*Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (the official was entitled to immunity from section 1983 suit because he did not violate the constitution).

Perkins' heavy reliance on *Good v. Curtis*, 601 F.3d 393 (5th Cir. 2010), to support his Fourth Amendment claim is unpersuasive. In *Good*, a police officer engaged in a "concerted effort" to "frame" a suspect by "manipulating a photo for a photo lineup to produce a false identification from an eyewitness." *Good*, 601 F.3d at 398. The Fifth Circuit, while addressing the plaintiff's Fourth Amendment claims, noted that at the time the officer swore out the probable cause affidavit for the arrest, he had "no evidence before him" suggesting that the plaintiff was the perpetrator other than the false identification the officer had created. Therefore, the officer could "not have reasonably believed that he had probable cause" to arrest the plaintiff. *Good*, 601 F.3d at 401.

Here, by contrast, even assuming that Perkins could rely upon Ledet's conduct towards a third party (Roy Patton), as discussed, Ledet did not engage in any improper conduct during his interrogation of Patton. Moreover, Ledet, as an investigator for Metro, was not involved in Perkins' arrest and seizure because, as Perkins acknowledges, Ledet simply referred the findings of the internal investigation to the District Attorney's Office, which ultimately presented the case to the Grand Jury for indictment. Therefore, Ledet cannot be liable for any alleged unreasonable arrest or seizure of Perkins. *See Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004) (once "facts supporting an arrest are placed before an independent intermediary such as a . . . grand jury, the intermediary's decision breaks the chain of causation" for the alleged constitutional violations).

Perkins also argues that, in *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003), the Fifth Circuit held that the knowing use of perjured testimony to secure an arrest is a violation of the Fourth Amendment. Perkins is mistaken. In *Castellano*, the Court held that the "manufacturing

of evidence and the state's use of that evidence along with perjured testimony" to obtain the plaintiff's wrongful conviction denied him of his due process rights under the Fourteenth Amendment, and not the Fourth Amendment. *Castellano*, 352 F.3d at 955. Moreover, as noted, in this case, Ledet did not engage in any improper behavior and it was the District Attorney's Office and the Grand Jury, not Ledet, that were responsible for Perkins' arrest and indictment.

To the extent that Perkins' claim can be liberally construed as an alleged violation of his substantive due process rights under the Fourteenth Amendment, the Court similarly finds it unpersuasive. The Fifth Circuit has opined that "coercive questioning by [an] officer may support a § 1983 substantive due process 'shocks the conscience' claim even when the suspects statements are not used at trial." *Edmonds v. Oktibbeha County, Miss.*, 675 F.3d 911, 916 (5th Cir. 2012). In this case, however, Perkins is complaining about the police interrogation of a third party, Roy Patton, and not of Perkins himself. Therefore, even if Patton could allege a violation of his substantive due process rights, such claim would not inure to the benefit of Perkins. *See Rakas*, 439 U.S. at 132 (noting that defendants will fail "to establish any prejudice to their own constitutional rights [when] they were not the persons aggrieved by the unlawful" police conduct); *Buckley v. Fitzsimmons*, 20 F.3d 789, 794-795 (7th Cir. 1994) (in a section 1983 suit where the plaintiff claimed that the police had coerced witnesses and paid them money to make false statements against him, the Court found, *inter alia*, that coercing a witness to speak would violate the right of "the person being interrogated to be free from coercion" but the plaintiff could not complain about the interrogation of the witness because "rights personal to their holders may not be enforced by third parties"); *see also Michaels v. New Jersey*, 222 F.3d 118, 121-122 (3rd Cir. 2000) (the alleged coercive techniques that were used to interview child

witnesses during a child abuse investigation against the plaintiff did not violate the plaintiff's constitutional rights).[6]

In any event, the Court concludes that Ledet did not violate Patton's substantive due process rights during the interview. To establish a substantive due process claim, the plaintiff must establish that the evidence of which he complains was obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience." *Chavez*, 538 U.S. at 774. As fully discussed, Ledet did not unduly pressure Patton to make any alleged false statement but merely encouraged him to cooperate and advised him of the consequences of cooperating or not cooperating. Therefore, the Court concludes that Ledet's conduct was not improper, let alone "shocking" to the conscience as it relates to Perkins. Accordingly, the Court rejects any substantive due process argument. *See Edmonds*, 675 F.3d at 916 (the plaintiff's due process claim was rejected because the police conduct during the questioning did not "shock" the conscience).

Metro further moves to strike certain portions of Perkins' declaration on the grounds that they do not comply with Fed. R. Civ. P. 56 (c). Because the Court finds that the challenged portions of Perkins' brief are not necessary for the resolution of this motion, it need not decide that aspect of Metro's motion.[7]

---

[6] The decisions in *Buckley* and *Michaels* both note that the actual use of the coerced testimony of a third party against the plaintiff at trial or in an affidavit for an arrest warrant may violate the plaintiff's due process rights. *See Buckley*, 20 F.3d at 795; *Michaels*, 222 F.3d at 122-123. Here, however, as noted, Ledet was not involved in Perkins' arrest and indictment (the District Attorney presented the case to the Grand Jury that indicted Perkins) and, more importantly, the charges against Perkins were dismissed prior to trial.

[7] It appears that all of the portions of Perkins' brief that Metro seeks to strike pertain to allegations that are relevant to Perkins' employment discrimination claim, which, as noted, Metro does not address in this motion for summary judgment.

## VI.     CONCLUSION

Based on the foregoing discussion, the Court finds that Marvin Ledet did not violate the constitutional rights of Roy Patton, let alone the rights of the plaintiff.  Therefore, the Court GRANTS Metro's motion for summary judgment with respect to the section 1983 claims against Ledet.

SIGNED at Houston, Texas this 19th day of October, 2012.

_____
Kenneth M. Hoyt
United States District Judge